**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| In re: | Chapter 13 |
| | Case No. 09-44865-HJB |
| ALLAN CORMIER, | |
| DEBORAH CORMIER, | |
| | |
| Debtors | |

**MEMORANDUM OF DECISION**

Before the Court is a request by the debtors in this Chapter 13 case to modify their confirmed plan.  The Chapter 13 trustee (the "Trustee") has objected to the proposed modification on the grounds that the debtors have not provided for payment of all of their projected disposable income into the proposed amended plan.  To resolve the issues in this case, the Court must determine whether the disposable income requirement of § 1322(b) of the United States Bankruptcy Code[1] applies to Chapter 13 plan modifications under § 1329 and, if so, whether a plan proposed by a below-median debtor must provide for the commitment of all of the debtor's disposable income during the portion of a Chapter 13 plan that extends beyond three years.

I.    FACTS AND TRAVEL OF THE CASE

Allan and Deborah Cormier (the "Debtors") filed a petition for relief under Chapter 13 of the Bankruptcy Code on November 13, 2009.  As part of the required financial

---

[1] See 11 U.S.C. § 101 et seq. (the "Bankruptcy Code" or the "Code").  All references to statutory sections are to the Bankruptcy Code unless otherwise specified.

1

schedules and statements (the "Schedules") filed with the case, the Debtors reported income less than the applicable median for a household of the same size in Massachusetts; thus, the Debtors are "below-median" debtors, thereby obviating application of the so-called "means test" set forth in § 707(b). In their later-amended Schedules, the Debtors reported $5,715.07 in monthly net income on Schedule I and $5,368.02 in monthly expenses on Schedule J, leaving a monthly surplus of $347.05.

On June 23, 2011, the Court confirmed the Debtors' Chapter 13 plan of reorganization (the "Plan"). The Plan required the Debtors to pay $407 per month for 36 months, to be paid toward prepetition mortgage loan arrears in the amount of $1,628.17 and attorney's fees in the amount of $1,874. The remainder would provide an estimated 4.26% dividend to general unsecured creditors. The Plan further provided for the avoidance of both a wholly unsecured second mortgage and a judicial lien on the Debtors' residence. A second piece of real property would be surrendered to a mortgagee.

The Plan also included several "miscellaneous provisions." Miscellaneous Provision 7 explained that the Debtors' Plan was a "pot plan,"

> in which the total of all payments in respect of non-priority unsecured claims (including the unsecured portion of undersecured claims) is a constant amount. The percentage dividend stated in this plan is an estimate based on claims currently known to the Debtor(s) and does not govern the amount of payments to non-priority unsecured creditors. Non-priority unsecured creditors are advised that they may receive more or less than the percentage dividend stated in this plan.

Third Amended Chapter 13 Plan 6, Dec. 27, 2010, ECF No. 84.[2]  In addition to the

---

[2] This description was also reflected in the order confirming the Plan (the "Confirmation Order"), which explained that:

monthly payments to be made from the Debtors' surplus monthly income, the Plan also required the Debtors to pay over any bonuses and tax refunds received during the term of the Plan (the "Excess Funds"), with the exception of a portion of the 2009 Excess Funds retained by the Debtors to repair one of their vehicles.

On March 22, 2012, the Debtors moved to modify the Plan and filed the proposed postconfirmation modified plan (the "Amended Plan").  On the same day, the Debtors' attorney also filed an application for approval of additional attorney's fees (the "Fee Application").  According to the Fee Application, the outstanding fees (if approved) totaled $2,820.58 after deduction of the prepetition retainer and amounts previously received from the Chapter 13 trustee (the "Trustee").  The Fee Application anticipated that those remaining fees would be paid "out of performance bonuses and tax refunds received during the remainder of the case, or following the case."  Fee Application 1, March 22, 2012, ECF No. 122.

The Trustee objected to the Fee Application in part, arguing that, pursuant to the confirmed Plan, the Excess Funds could not be used to pay additional attorney's fees, since those funds were required to be turned over to the Trustee for distribution.  In response, the Debtors argued that the "applicable commitment period" under § 1322(b)(4) would end on November 13, 2012, and they would have no obligation to commit all of their disposable income to a Chapter 13 plan after that date.  Accordingly,

---

This is a "pot" plan, in which the total of all payments in respect to unsecured creditors is a constant amount.  The Trustee shall distribute the balance rateably amongst holders of other allowed unsecured claims.  The percentage dividend stated in this plan is an estimate based on claims currently known to the Debtor and does not govern the amount of payments to unsecured creditors.  General unsecured creditors are advised that they may receive more or less than the percentage dividend stated in this plan.

Confirmation Order 3, ECF No. 106.

the Debtors said, they could retain the Excess Funds and use them to pay their attorney's fees.

On April 24, 2012, the Court held a hearing on the Fee Application (the "Fee Hearing").  The reasonableness and propriety of the requested fee amount was not disputed, leaving only the issue of how those fees were to be paid.  During the Fee Hearing, the Court ruled that since the Excess Funds remained property of the Debtors' bankruptcy estate, they must be turned over to the Trustee.  The Court further stated that, although payments to secured creditors may sometimes be made "outside" of a Chapter 13 plan, payment to an administrative creditor outside the plan is inconsistent with the Chapter 13 trustee program and would be improper in this case.  Thus, the Court ordered the Debtors to further amend their plan to provide for the turnover of Excess Funds to the Trustee and payment of the attorney's fees through the plan.[3] Because the Debtor's proposed Amended Plan and the Trustee's objection thereto (the "Plan Objection") remained outstanding, the Court extended the deadline for the Debtors to file the further amended plan until resolution of the Plan Objection.

Postconfirmation modification of the Debtors' Plan has been necessitated by the incurrence of substantial postpetition tax claims arising from the foreclosure of the real property surrendered under the confirmed Plan.[4]  Through the Amended Plan, the

---

[3] While the Debtors' attorney indicated that the attorney's fees *are* included in the Amended Plan, those fees – in the amount of $1,874 – reflect the fees contemplated when the original Plan was confirmed, and those fees have already been paid by the Trustee.  Accordingly, the further amendment is required to account for the additional $2,820.58 in fees allowed at the Fee Hearing.

[4] The Debtors are not to blame for the time-delay between the filing of the case and the actual foreclosure of the real property surrendered through the Plan.  In fact, the Debtors earlier asked this Court to essentially order the mortgage-holding bank to take the property or conduct a swift foreclosure.  Although this request was denied for the reasons stated in In re Cormier, 434 B.R.

Debtors propose to pay $15,000 now owed to the Internal Revenue Service (the "IRS Claim"), while a postpetition liability to the Massachusetts Department of Revenue (the "MDOR Claim") is to be paid outside of the Amended Plan.[5]   The Amended Plan extends the term of the plan from 36 to 60 months, and the plan payment has been increased to $555 per month.[6]   Any further distribution to general unsecured creditors ceases under the Amended Plan, thus fixing the dividend at 5.65% based on the proofs of claim actually filed in the case; all payments under the Amended Plan are dedicated to the payment of postpetition priority and administrative claims.

Furthermore, as in the Fee Application, the Amended Plan provides for payment of the additional attorney's fees from the Excess Funds.  It also states that the Debtors will retain a $3,318.54 bonus received in 2011 in order to pay $2,995 on the MDOR Claim[7] and $323.54 for "unscheduled expenses."   And finally, in Miscellaneous Provision 9, the Amended Plan allows the Debtors to "prepay their obligations under the plan at any time after the third anniversary of this case, provided that all disposable income attributable to the applicable commitment period has been devoted to plan payments as required by law."  Fourth Amended Post-Confirmation Chapter 13 Plan 6, March 22, 2012, ECF No. 120.

The Trustee has objected to the Amended Plan on the grounds that it does not

---

222 (Bankr. D. Mass. 2010) ("Cormier I"), the Court was not without sympathy for the Debtors' desire to have the foreclosure completed as soon as practicably possible.

[5] According to the Debtors, the MDOR Claim is being paid directly by the Debtors and not through the Amended Plan because the MDOR has not filed a proof of claim.

[6] This amount is less than the Debtors' monthly excess income of $586, as shown on further amended Schedules I and J that were attached to the Amended Plan.

[7] In the amended Schedules I and J, however, the Debtors deduct $100 per month from their income on account of payments to the MDOR on its claim.

provide for turnover of all the Debtors' disposable income during the extended term of

the plan.   She objects to any prepayment of the Amended Plan to the extent a

prepayment is to be accomplished through the use of the Excess Funds, which, under

the confirmed Plan, are already required to be turned over to the Trustee.   The Debtors

assert in response that the disposable income requirement does not apply to

postconfirmation plan modifications and, as below-median debtors, they are not

required to submit all of their disposable income to the Amended Plan beyond the first

36 months.   After a hearing on the Trustee's Plan Objection and the Debtors' response,

the Court took the matter under advisement.


II.     POSITIONS OF THE PARTIES

        The Trustee's Plan Objection largely centers on the Debtors' attempt to retain the

Excess Funds either for personal use or to make payments on postpetition priority debts

outside the Amended Plan.   The Trustee maintains that the Debtors are required by

§ 1325(b)(1)(B) to submit all of their disposable income to the Chapter 13 plan during

the life of the plan.   The Debtors argue, however, that this Court should adopt the

majority view that postconfirmation modification of a plan pursuant to § 1329 does not

require compliance with § 1325(b), and the Amended Plan is thus not subject to the

disposable income requirement of subsection (b)(1)(B).   The Debtors ask the Court to

consider a debtor's disposable income as only one factor among others in determining

whether, under the totality of the circumstances, the modification has been proposed in

good faith.

        And the Debtors further maintain that even if the Court determines that § 1325(b)

applies to postconfirmation plan modifications, the Amended Plan meets § 1325(b)'s disposable income test.  Because the Debtors are below-median debtors, they say that the "applicable commitment period" is only three years and will end in November 2012. The Debtors interpret the 2005 amendments to the Bankruptcy Code ("BAPCPA")[8] as having altered the meaning of § 1325(b)(1), now requiring below-median debtors to pay all of their disposable income only during the statutorily-defined, three-year "applicable commitment period."  Thus, the Debtors argue, below-median debtors are required to devote all of their disposable income to a Chapter 13 plan only during the first three years of the plan, even if the plan extends for more than those three years.  A contrary reading of the statute, the Debtors say, would "trap" them "into paying all of their monthly net income for sixty months," and would create a "'gotcha' rule . . . contrary to the plain language of the statute."  Response to Trustee's Objection to Confirmation of Fourth Amended Chapter 13 Plan 5, April 30, 2012, ECF No. 130.

For just such a contrary reading, the Trustee points to a recent case from New Hampshire, in which Judge Deasy rejected an argument identical to the one presented by the Debtors in this case.  In In re Rodger, 423 B.R. 591 (Bankr. D.N.H. 2010), Judge Deasy ruled that below-median debtors must pay all of their disposable income into the Chapter 13 plan for the entire term of the plan, even if it extends beyond the three-year applicable commitment period.  The Trustee urges this Court to accept the reasoning in Rodger and hold that, when below-median debtors voluntarily extend the length of a Chapter 13 plan beyond the three-year applicable period, they must comply with the disposable income requirement of § 1325(b) through the entire life of the plan.

---

[8] See Bankruptcy Abuse Prevention and Consumer Act of 2005, Pub. L. 109-8, 11 Stat. 23 (2005).

Finally, while the Trustee objects to the "prepayment" option in the Amended Plan, she has conceded that she does "not object to the possibility of the prepayment." Plan Objection 5, April 23, 2012, ECF 129.   Instead, the Trustee objects to that provision's assumption that the Excess Funds are not already required to be paid into the Amended Plan, reiterating her argument that "the Debtors must account for the bonus income and tax refunds during the full term of the Post-confirmation Plan." Id. And, consistent with the previous limited objection to the Fee Application, the Trustee also objects to the payment of attorney's fees outside the plan.

III.   DISCUSSION

So long as the Debtors remain in Chapter 13, the Excess Funds are property of their bankruptcy estate, see 11 U.S.C. §§ 541, 1306(a); see also In re Rangel, 233 B.R. 191, 193-34 (Bankr. D. Mass. 1999); Matos v. Rivera (In re Matos), BAP No. PR 11-074 (B.A.P. 1st Cir. Sept. 26, 2012),[9] and constitute a portion of the Debtors' "disposable income" under § 1325(b)(2).[10]   Pursuant to § 1325(b)(1), at the time the original Plan

---

[9] Under § 1327(b), estate property vests in the debtor upon confirmation "*except as otherwise provided in the plan or the order confirming the plan.*" 11 U.S.C. § 1327(b) (emphasis supplied). In this district, standard Chapter 13 confirmation orders *do* provide otherwise – property of the estate, including postpetition property, remains estate property and does not vest in the debtor until discharge. See Mass. Local. Bankr. R. Official Local Form 4 ("Unless otherwise ordered by the Court, all property of the estate as defined in §§ 541 and 1306 . . . shall remain property of the estate during the term of the Plan and shall vest in the debtor(s) only upon discharge. . . . The debtor(s) shall not transfer, sell or otherwise alienate property of the estate other than in accordance with the confirmed Plan or other order of the bankruptcy court.  The debtor shall be responsible for preserving and protecting property of the estate.").

[10] For below-median debtors, such as the Debtors in this case, disposable income is calculated by deducting from the debtor's income those amounts "reasonably necessary" for the maintenance or support of a debtor and his or her dependents (as well as certain charitable contributions and business expenses).  11 U.S.C. § 1325(b)(2).  Those expenses are usually reflected on the below-median debtor's Schedule J.

was confirmed, the Debtors were required to devote all of their projected disposable income,[11] including the Excess Funds, to make payments under the Plan.  Section 1325(b)(1) states that, if the Chapter 13 trustee or an unsecured creditor objects to confirmation,[12] then a Chapter 13 plan cannot be confirmed unless all projected disposable income is used to make payments under the plan – the "disposable income test."  11 U.S.C. § 1325(b)(1).  That section provides, in relevant part:

> (b)(1)  If the trustee or the holder of allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –
>
> . . .
>
> (B)   the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. § 1325(b)(1).

Under the proposed Amended Plan, however, the Debtors intend to turn over the Excess Funds to the Trustee only until November 2012 (the three-year anniversary of the Plan), and to retain the Excess Funds during the remainder of the term of the Amended Plan.  They argue that this is permissible either because (i) the disposable income test of § 1325(b) does not apply to Chapter 13 plan modifications under § 1329 or (ii) they are required only to turn over all disposable income during the three-year

---

[11]  Projected disposable income under § 1325(b)(1)(B) is generally the disposable income calculated under § 1325(b)(2), but takes into account any changes in income or expenses "that are known or virtually certain at the time of confirmation."  Hamilton v. Lanning, -- U.S. --, 130 S.Ct. 2464, 2469, 2470 (2010); Kibbe v. Sumski (In re Kibbe), 361 B.R. 302, 314-15 (B.A.P. 1st Cir. 2007).

[12]  While § 1325(b) applies only when an objection is raised, the majority of debtors will propose a plan that complies with that section from the outset, as failure to do so will certainly draw an objection by the Trustee.

"applicable commitment period" specified in § 1325(b)(4), even if the plan term is extended beyond three years.

### A. Applicability of the Disposable Income Test under § 1325(b) to Postconfirmation Plan Modifications under § 1329

Section 1329 governs the modification of a confirmed plan, and provides, in relevant part:

(a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to –

    (1) Increase or reduce the amount of payments on claims of a particular class provided for by the plan;

    (2) Extend or reduce the time for such payments;
. . .

(b) (1) *Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section.*
. . .

(c) A plan modified under this section may not provide for payments over a period that expires after the applicable commitment period under section 1325(b)(1)(B) . . . , unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years . . . .

11 U.S.C. § 1329 (emphasis supplied).  Here, the Debtors request modification of the Plan in order to account for payment of postpetition priority claims and to extend the term of the plan in order to accommodate payment of those claims.  In so modifying the Plan, however, they say that the disposable income test of § 1325(b) does not apply because that provision is not made expressly applicable to plan modifications under § 1329(b)(1).

The applicability of § 1325(b) to postconfirmation plan modifications under

§ 1329(b) has been much debated;

> [s]ome courts hold that § 1325(b) does not apply to modification because § 1329(b)(1) fails to reference the subsection. Other courts hold that § 1325(b) applies to modification because the preface of § 1325(a) cross-references § 1325(b). Subsection (1) of § 1325(a) has also been cited as a means of incorporating § 1325(b). Different rules of statutory construction can be employed to support either position.

In re Fields, 269 B.R. 177, 179 (Bankr. S.D. Ohio 2001) (citations omitted).

The Debtors urge the Court to adopt the reasoning employed by the Ninth Circuit Bankruptcy Appellate Panel and the majority of courts to follow, namely, that "the plain language of § 1329(b) does not mandate satisfaction of the disposable income test of § 1325(b)(1)(B) with respect to modified plans." In re Sunahara, 326 B.R. 768, 781 (B.A.P. 9th Cir. 2005).[13] According to this "exclusion" approach, the failure of § 1329(b)(1) to specifically reference § 1325(b) means that the provisions of § 1325(b) simply do not apply to postconfirmation plan modifications. Accordingly, those courts have declined to require compliance with the disposable income test, reserving consideration of a debtor's disposable income as but one factor in assessing whether the modification has been proposed in good faith, as required by § 1325(a). See, e.g., Sunahara, 326 B.R. at 781.

This Court finds the majority's logic reasonable, but (as another court has characterized it) "debatable." In re Keller, 329 B.R. 697, 700 (Bankr. E.D. Cal. 2005). Looking solely to the named provisions in § 1329(b)(1), and § 1325(b)'s notable

---

[13] See also, e.g., In re Tibbs, -- B.R. --, 2012 WL 3800784, *5-6 (Bankr. S.D. Fla. Sept. 4, 2012); Mattson v. Howe (In re Mattson), 468 B.R. 361, 372 (B.A.P. 9th Cir. 2012); In re Grutsch, 453 B.R. 420, 424-25 (Bankr. D. Kan. 2011); In re Davis, 439 B.R. 863, 867-69 (Bankr. N.D. Ill. 2010); In re Kearney, 439 B.R. 694, 696 (Bankr. E.D. Wis. 2010); In re Hall, 442 B.R. 754, 760-61 (Bankr. D. Idaho 2010); In re White, 411 B.R. 268, 275 (Bankr. W.D.N.C. 2008); In re Ireland, 366 B.R. 27, 32 (Bankr. W.D. Ark. 2007); In re Turek, 346 B.R. 350, 358-59 (Bankr. M.D. Pa. 2006).

absence therefrom, it is easy to conclude that § 1325(b)'s requirements do not apply to postconfirmation modifications.  A closer reading of the applicable provisions, however, demonstrates that § 1325(b) *is* applicable to such modifications, by operation of § 1325(a).  As the Keller court explained:

> [t]he omission of section 1325(b) from section 1329(b) should not be taken to mean that section 1325(b) is not applicable to modified plans.  Section 1329(b) requires that a modified plan comply with section 1325(a). Section 1325(a), in turn, provides that *"[e]xcept as provided in subsection (b)*, the court shall confirm a plan if" the six requirements of sections 1325(a)(1)-(a)(6) are satisfied.  . . . Rather than read section 1325(b) as always qualifying section 1325(a), the [exclusion approach] in effect interpreted the first phrase in section 1325(a) as if it read, "if subsection (b) applies."  *The cross-reference in section 1325(a) to section 1325(b) suggests that subsection (b) comes into play whenever subsection (a) is applicable.*

Id. at 702 (emphasis supplied).[14]

The Keller court found no solace in the notion that the trustee and unsecured creditors could still object to postconfirmation plan modification on grounds that a debtor lacked good faith in proposing the modified plan.  Instead, the court there opined that such an approach "once again threatens to place chapter 13 debtors at the mercy of a good faith standard that is sure to produce disparate results and be arbitrary in its application."  Id. at 702-03.  The court found this result an anathema to the purpose of the 1984 amendments to the Bankruptcy Code, which added § 1325(b) to curb the lack of uniformity that frequently arose from the resort to a good faith standard in determining whether the amounts debtors proposed to pay into a Chapter 13 plan were sufficient. Keller, 329 B.R. at 702-703 (citing, quoting Oversight Hr'g on Personal Bankr. Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the

---

[14] The version of § 1325(a) applicable in the Keller case contained only six subsections; after the BAPCPA amendments, the number of subsections increased to nine.

Judiciary, 97th Cong., 1st and 2nd Sess. 184-85, testimony of Judge Conrad K. Cyr.);

see also In re Heideker, 455 B.R. 263, 272 (M.D. Fla. 2011) (reliance on the "good faith"

requirement of § 1325(a)(3) to prevent potentially abusive modifications was "ironic

given that section 1325(b) was added to the Bankruptcy Code in 1984 to resolve the

'spate of discordant judicial opinions' regarding the application of the 'good faith'

standard").

In a more recent case, the court in In re Heideker similarly concluded that

§ 1325(b) applies to postconfirmation plan modifications, as that section is implicitly

incorporated through the applicability of § 1325(a).  455 B.R. at 269.  The Heideker

court also rejected the argument in favor of the exclusion approach raised in In re Davis,

where the court held that § 1329's reference to the "requirements of § 1325(a)" refers

only to the conditions imposed by subsections (a)(1) through (a)(9) and does not include

the "exceptions" found in § 1325(b). 439 B.R. 863, 867 (Bankr. N.D. Ill. 2010).  Instead,

the Heideker court noted that compliance with § 1325(b) "is a requirement (i.e., a

requisite or essential condition) if the trustee or a holder of an unsecured claim objects

to plan confirmation." Heideker, 455 B.R. at 269-70 (emphasis supplied).

The Heideker court further responded to the assertion that application of

§ 1325(b) and its "applicable commitment period" requirements to postconfirmation

modifications would render § 1329(a)(2) meaningless.  Noting that § 1329(a)(2) allows

modification of a plan to reduce the time for making plan payments, some courts have

found that reduction of plan length would be impossible, and thus the provision

rendered meaningless, for an above-median debtor if § 1325(b) also applied, since

§ 1325(b) mandates a 5-year commitment period for those debtors – no less.[15]  But the
Heideker court was not persuaded, noting instead that while an *above-median* debtor
would not be able to reduce the length of the plan to under 5 years if unsecured
creditors were not paid in full (thus arguably making it impossible for such debtors to
modify a plan under § 1329(a)(2)), the provision was not rendered meaningless
because it would continue to apply to a *below-median* debtor seeking to reduce the
length of a plan originally confirmed for more than 3 years.  Id. at 270; see 11 U.S.C.
§ 1322(d)(2).

The Heideker court also rightly noted that the failure to apply § 1325(b)
requirements to postconfirmation plan modifications would invite abuses of the
modification process – encouraging debtors to attempt an end-run around § 1325(b)'s
requirements by confirming a compliant plan then requesting modification of the plan to
avoid further compliance with that section.   And the Heideker court agreed with the
court's observation in In re King, 439 B.R. 129, 136 (Bankr. S.D. Ill. 2010), that
application of § 1325(b)'s disposable income test to postconfirmation modification was
more logical in light of a trustee's or creditor's ability to request modification when a
debtor's income increases postpetition.  Heideker, 455 B.R. at 270-71.

This Court agrees with Judge Hillman's conclusion in In re Martin, that the
"arguments excluding the application of [§ 1325(b)] are not as strong as the ones to
include it." 232 B.R. 29, 37 (Bankr. D. Mass. 1999).  Therefore, the Court adopts the
analyses presented by the Keller and Heideker courts, and holds that the requirements
of § 1325(b) apply to postconfirmation modifications under § 1329 when a trustee or

---

[15] See 11 U.S.C. § 1325(b)(4)(A)(ii) (for an above-median debtor, the "applicable commitment
period" is "not less than 5 years").

creditor objects to the proposed modified plan.  See also, In re Stretcher, 466 B.R. 891

(Bankr. W.D. Tex. 2011).   Accordingly, the disposable income test applies to the

Debtors' Amended Plan, and to the extent the Amended Plan does not conform to the

requirements of § 1325(b), it cannot be confirmed.

### B. Application of the Disposable Income Test beyond the Applicable Commitment Period

In light of the Trustee's Plan Objection, the disposable income test is implicated

and the plan cannot be confirmed unless it "provides that all of the debtor's projected

disposable income to be received *in the applicable commitment period* . . . will be

applied to make payments to unsecured creditors under the plan," 11 U.S.C.

§ 1325(b)(1)(B) (emphasis supplied).   Because the Debtors are below-median debtors,

§ 1325(b)(4)(A)(i) defines the "applicable commitment period" as three years, see 11

U.S.C. § 1325(b)(4)(A)(i), and the plan term may be extended for longer than three

years (although no more than five) only if the Court, "for cause, approves a longer

period," 11 U.S.C. § 1322(d)(2).

The Debtors argue that although the plan term may be extended "for cause," as

they propose in the Amended Plan, the "applicable commitment period" during which

they are required to apply all disposable income remains three years.   Thus, according

to the Debtors, they are not required to devote all of their disposable income to the

Amended Plan during years four and five, and may use those funds to pay personal

expenses and other debts (such as the attorney's fees and the MDOR Claim) or to pay

off the Amended Plan earlier than the estimated 60 months.

Judge Deasy recently considered and rejected an identical argument in In re

Rodger, 423 B.R. 591 (Bankr. D.N.H. 2010), holding instead that below-median debtors

15

who propose a plan longer than the statutorily-required three years must devote all of

their disposable income to the plan during its entire term.  In that case, the court initially

confirmed the below-median debtors' five-year plan.  The Chapter 13 trustee then filed a

motion to modify the plan to require the debtors to turn over any tax refunds received

during the entire term of the plan for distribution.  Id. at 593.  The debtors argued that

they were not required to turn over the tax refunds during years four and five of the plan

because the "applicable commitment period" during which they were required to submit

of all their disposable income to the plan was only three years.  Id. at 594.

> Judge Deasy disagreed, reasoning that:
>
> Section 1325(b)(1) . . . serves to set the minimum term of a chapter 13
> plan.  . . . [I]t does not set the *maximum* term of a chapter 13 plan.
> Instead, the maximum term for a chapter 13 plan is determined under
> § 1322(d).  . . . For a below median debtor, the maximum term is three
> years, unless the Court, for cause, approves a longer period with the term
> of the plan not to exceed five years.  11 U.S.C. § 1322(d)(2). . . .
> . . .
>
> Nothing in § 1322 states, or even suggests, that below median debtors are
> not required to submit their disposable income to fund their chapter 13
> plan for the full term of the plan. . . . [T]he requirements for payment of
> disposable income in years four and five of the plan remain the same as
> those in the first three years of the plan.  Nothing in the language or
> policies of the Bankruptcy Code suggest otherwise.

Id. at 594, 595.

In response to the debtors' motion for reconsideration, Judge Deasy explained

further that extension of a below-median debtor's plan for more than three years was

only permissible if the court found "cause" to extend the term of the plan.  Id. at 597.

Cause existed in that case because the debtors "needed the increased payments and

increased term to cure arrearages on secured mortgage and tax claims on their

principal residence and to pay priority administrative unsecured claims for attorneys'

fees and trustee fees." Id. But Judge Deasy "[did] not believe that 'cause' can exist when debtors are utilizing less than their disposable income during the extended term." Id. at 598. Cf. In re Richall, 470 B.R. 245, 249 (Bankr. D.N.H. 2012) ("after BAPCPA, courts may deny confirmation of a chapter 13 plan proposed by a below median debtor, which stretches beyond a three year period and pays creditors in full but does not commit all disposable income, because a court could find that no cause exists to extend the plan longer than three years when a debtor can pay off creditors within the commitment period"); In re Nunez, 2010 WL 816788, *3, 4 (Bankr. E.D. Wis. 2010).

This Court agrees with Judge Deasy's conclusion that below-median debtors who voluntarily seek a plan extension for cause beyond the applicable three-year commitment period must devote all of their disposable income toward the plan for its entire duration. The Court would be hard-pressed to find cause to extend the term of a below-median debtor's plan if the debtor is not paying all of his or her disposable income into the plan until its completion. Here, cause exists to extend the term of the Debtors' plan in order to comply with § 1322(a)'s requirement that all priority claims (including tax claims and attorney's fees) be paid in full unless the creditor agrees otherwise. See, e.g., Rodger, 423 B.R. at 597; In re Tozer, 392 B.R. 758, 759, 760 (Bankr. W.D. Wis. 2008).[16] But failure to provide all of the Debtors' disposable income toward completing the plan would unfairly extend the automatic stay and other protections afforded by the Bankruptcy Code while allowing the Debtors to spend the

---

[16] See also 11 U.S.C. §§ 330(a)(4)(B) (court may allow reasonable attorney's fees for a chapter 13 debtor); 503(a)(2) (attorney's fees awarded under § 330(a) constitute an administrative expense); 507(a)(2) (priority treatment for attorney's fees awarded under § 330(a)); 507(a)(8) (priority treatment for certain tax claims); 1305(a) (providing for filing of postpetition tax claims); 1322(a)(2) (plan must provide for full payment of all priority claims unless claimant agrees otherwise); 1322(b)(6) (plan may provide for payment of postpetition tax claims).

Excess Funds on items not reasonably necessary for their support and the support of their dependents.[17]

Furthermore, as the Court stated at the Fee Hearing, the Debtors' intention to use a portion of the Excess Funds not for personal expenses, but to pay priority claims outside the Amended Plan, is inappropriate.  "The general rule is that debtors make monthly payments to the trustee, who then disburses the monies to holders of allowed claims."  In re Perez, 339 B.R. 385, 389 (Bankr. S.D. Tex. 2006), aff'd Perez v. Peake, 373 B.R. 469 (S.D. Tex. 2007) (citations omitted): see also In re Foster, 670 F.2d 478, 486 (5th Cir. 1982) (normal presumption is that payments to creditors will be made through the Chapter 13 trustee); In re Machado, 378 B.R. 14, 18 (Bankr. D. Mass. 2007) ("plan payments through the trustee are the norm").  While in this district it is customary for debtors to make regular monthly payments directly to certain secured creditors, the Court sees no reason here to countenance the payment of other types of claims in such a fashion.  See In re Bernard, 201 B.R. 600, 603 (Bankr. D. Mass. 1996) ("debtors may depart from the norm of payments to creditors by the Chapter 13 Trustee only if they advance a 'significant reason' for doing so").  While it is true that the Court has discretion to allow payment of certain claims directly by a debtor and not through the Chapter 13 trustee, see Perez, 339 B.R. at 390, Machado, 378 B.R. at 18; In re Vigil, 344 B.R. 624, 629 (Bankr. D.N.M. 2006), the Court declines to exercise that discretion in this case for the reasons so thoroughly articulated in other cases, such as In re

---

[17] To the extent the Debtors are concerned with needing some of the Excess Funds for unanticipated expenses that are reasonably necessary for their support, there is no evidence that the Trustee would be unwilling to consider allowing them to retain the appropriate funds – as evidenced by the willingness of the Trustee to allow the Debtors to retain a portion of the Excess Funds in order to repair one of their vehicles.  And if the Debtors are unable to reach a resolution with the Trustee, they are free to seek a determination from this Court.  See, e.g., In re Hilgendorf, 2011 WL 353240, *3, 4 (Bankr. E.D. Wis. 2011).

Perez, 339 B.R. 385, In re Vigil, 344 B.R. 624, and In re Harris, 200 B.R. 745, 747 (Bankr. D. Mass. 1996).

As for the MDOR Claim, which the Debtors propose to pay directly either through a monthly deduction from their income as reflected on Schedule J or by using a portion of the Excess Funds, the Court notes that that claim should be provided for in the Amended Plan.  While the Debtors argue that the MDOR has "declined" to file a proof of claim for the postpetition taxes, the Bankruptcy Rules allow the Debtors or the Trustee to file the claim, see Fed. R. Bankr. P. 3004, enabling payment of the MDOR Claim through the Debtors' plan.  Instead, the Debtors have attempted to pay the claim by simply subtracting that monthly payment as part of their expenses (thus reducing their monthly disposable income) and by using the Excess Funds (an estate asset) to pay the claim outside the plan.  This methodology, as noted, was disapproved by the Court at the Fee Hearing, as well as in Cormier I.  424 B.R. at 233 ("the Debtors are essentially asking this Court to permit a modification of the Plan and a reduction of the dividend to unsecured creditors without filing a motion and providing adequate notice to interested parties in contravention of the Federal and Local Bankruptcy Rules. . . . the Court [cannot] sanction the procedure by which the Debtors seek reimbursement of their claimed administrative expenses or deduction of those expenses from their disposable income currently used to fund the Plan").  Accordingly, the Debtors must further amend their Chapter 13 plan to account for *all* postpetition priority claims and administrative expenses, and may not directly deduct those payments from their monthly income or use estate assets to pay the claims other than through the Chapter 13 plan.

## C. Early Completion of the Modified Chapter 13 Plan

The Trustee's objection to the Debtors' Miscellaneous Provision 9 is directed toward that provision's implication that the Debtors are not required to turn over the Excess Funds during the life of the plan. Having determined that the Debtors must pay the Excess Funds to the Trustee for distribution under the plan, the Trustee appears to raise no objection to the provision's presumption that the plan is completed upon satisfaction of the remaining priority and administrative claims, even if payment of the claims takes less than the estimated 60 months. This Court agrees that, under the circumstances of this case, where the applicable commitment period is only 36 months, the plan may be completed upon satisfaction of the remaining priority and administrative claims, even though the general unsecured creditors will receive no further distribution.[18]

Because the tax claims and the attorney's fees are entitled to priority, the Court cannot confirm a modified plan unless it provides that those claims will be paid in full. See 11 U.S.C. § 1322(a)(2); Bentley v. Boyajian (In re Bentley), 266 B.R. 229, 236 (B.A.P. 1st Cir. 2001). And because those claims take priority, they do not share distribution of the disposable income *pro rata* with the general unsecured creditors. In

---

[18] Under § 1325(b)(1)(B), the plan must provide for all disposable income to be paid for distribution to "unsecured creditors." This statutory language changed the pre-BAPCPA reference to "payments under the plan" to the current requirement that disposable income be paid to "unsecured creditors." This new phrase has created quite a bit of consternation, little of which is relevant here. Suffice it to say that this Court adopts the conclusion reached in In re Echeman that "both the debtor's priority unsecured creditors and nonpriority unsecured creditors are to be paid from his projected disposable income pursuant to § 1325(b)(1)(B)." 378 B.R. 177, 182 n.7 (Bankr. S.D. Ohio 2007); see also, e.g., In re Williams, 394 B.R. 550, 563-64 (Bankr. D. Colo. 2008); In re Puetz, 370 B.R. 386, 392 (Bankr. D. Kan. 2007); but see In re Amato, 366 B.R. 348 (Bankr. D.N.J. 2007) (attorney's fees could not be paid from above-median debtor's disposable income, because those fees were not specifically included in the expense portion of applicable form and did not qualify as an "unsecured claim" to be paid from disposable income).

re Brown, 2008 WL 4372675 (Bankr. S.D. Ohio April 15, 2008).   Accordingly, it is

permissible for the plan, as modified, to cease distribution to general unsecured

creditors while devoting the disposable income toward payment of the priority claims in

full.[19]

The Debtors here are not attempting to "pay off" their Chapter 13 plan prior to the

expiration of the applicable commitment period.   See, e.g. In re Filion, 452 B.R. 329,

333 (Bankr. D. Mass. 2011); see also Hon. W. Homer Drake, Hon. Paul W. Bonapfel, &

Adam M. Goodman, Chapter 13 Practice & Procedure § 9F:67: "Temporal" and

"monetary" approaches to applicable commitment period (West 2012) (summarizing

issues and collecting cases).   And this is not a case where the Debtors initially proposed

a longer plan term and now balk at paying unsecured creditors more than the originally-

projected dividend, thus receiving a "windfall."   See, e.g., In re Witkowski, 16 F.3d 739

(7th Cir. 1994); In re Stamm, 265 B.R. 10 (Bankr. D. Mass. 2001); see also In re Smith,

334 B.R. 26, 37-38 (Bankr. D. Mass. 2005).

For these reasons, the Court determines that the provision allowing for

completion of a modified plan upon satisfaction of the postpetition priority and

administrative claims is not objectionable.

IV.   <u>CONCLUSION</u>

The Debtors will be ordered to file a further amended plan that (1) provides for

the dedication of all projected disposable income, including the Excess Funds, to the

---

[19] Put another way, cessation of payments to unsecured creditors at this juncture is consistent
with the fact that, had the priority claims been included in the Plan from the outset, and had the
Debtors' disposable income been sufficient only to pay those priority claims over the applicable
commitment period, no dividend to general unsecured creditors would have been required for
confirmation.

plan for the entire term of the plan; (2) accounts for all postpetition priority claims; and (3) strikes the language allowing the Debtors to use the Excess Funds for payment of any priority claim outside the plan. The Debtors will also be ordered to file amended schedules I and J to accurately reflect current monthly income and those expenses reasonably necessary for the maintenance and support of the Debtors and their dependents. An order in conformity with this memorandum shall issue forthwith.

DATED: September 27, 2012                    By the Court,

_____
                                             Henry J. Boroff
                                             United States Bankruptcy Judge